# THE UNITED STATES COURT OF FEDERAL CLAIMS
## (BID PROTEST)

|  |  |  |
|---|---|---|
| CSI AVIATION, INC. | ) | |
| *Plaintiff,* | ) | |
| v. | ) | Case No. 18-253C |
| THE UNITED STATES OF AMERICA, | ) | Judge Griggsby |
| *Defendant,* | ) | |
| and | ) | Public Version |
| CLASSIC AIR CHARTER, INC. | ) | |
| *Defendant-Intervenor.* | ) | |

## PLAINTIFF CSI AVIATION INC.'S
## MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Pursuant to Rules 52.1, 57 and 65 of the Rules of the United States Court of Federal Claims and the Court's May 2, 2018 Scheduling Order, ECF No. 29, Plaintiff CSI Aviation, Inc. ("CSI"), by and through its counsel, respectfully moves the Court for judgment on the administrative record, and requests that the Court grant judgment in its favor.

As more fully described in the accompanying Memorandum in Support of its Motion for Judgment on the Administrative Record, CSI seeks a declaratory judgment and a permanent injunction to set aside the arbitrary, capricious, and unlawful decision by the United States, acting by and through United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE" or "Agency") to award Classic Air Charter Inc. ("CAC") an order, against the General Service Administration schedule under Request for Quote No. HSCECR-17-Q-00005 ("RFQ"), to provide daily charter flight services.

Specifically, CSI requests that this Court enter (i) an order declaring that the Agency was arbitrary and capricious and acted in violation of the applicable law and regulations when it awarded the ICE task order to CAC, and (ii) an injunction setting aside the Agency's task order award to CAC and requiring the Agency to re-procure the daily charter flight services consistent with the law and the terms of the RFQ.

WHEREFORE, Plaintiff CSI respectfully requests that this Court issue an order granting the relief requested.

Respectfully submitted,

Vedder Price, P.C.

s/ Eric J. Marcotte
Eric J. Marcotte
David M. Hernandez
Kelly E. Buroker
Tamara Droubi

*Counsel for CSI Aviation, Inc.*

DATED: May 15, 2018

# THE UNITED STATES COURT OF FEDERAL CLAIMS
## (BID PROTEST)

|  |  |  |
|---|---|---|
| CSI AVIATION, INC. | ) | |
|  | ) | |
| *Plaintiff,* | ) | |
|  | ) | |
| v. | ) | Case No. 18-253C |
|  | ) | Judge Griggsby |
| THE UNITED STATES OF AMERICA, | ) | |
|  | ) | **FILED UNDER SEAL** |
| *Defendant,* | ) | |
|  | ) | |
| and | ) | |
|  | ) | |
| CLASSIC AIR CHARTER, INC. | ) | |
|  | ) | |
| *Defendant-Intervenor.* | ) | |
|  | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFF CSI AVIATION, INC.'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

VEDDER PRICE P.C.

Eric J. Marcotte, Esq.
Vedder Price P.C.
1401 I Street, NW, Suite 1100
Washington, DC 20005
202-312-3336 (direct dial)
202-312-3322 (facsimile)
emarcotte@vedderprice.com

*Counsel of Record for Plaintiff
CSI Aviation, Inc.*

DATED: May 15, 2018

Of Counsel:

David M. Hernandez
Vedder Price P.C.
1401 I Street, NW, Suite 1100
Washington, DC 20005
(202) 312-3340 (phone)
(202) 312-3322 (fax)
dhernandez@vedderprice.com

Tamara Droubi
Vedder Price P.C.
1401 I Street, NW, Suite 1100
Washington, DC 20005
(202) 312-3368 (phone)
(202) 312-3322 (fax)
tdroubi@vedderprice.com

Kelly E. Buroker
Vedder Price P.C.
1401 I Street, NW, Suite 1100
Washington, DC 20005
(202) 312-3339 (phone)
(202) 312-3322 (fax)
kburoker@vedderprice.com

**TABLE OF CONTENTS**

Page

INTRODUCTION AND STATEMENT OF THE CASE ..................................................1

QUESTION PRESENTED ...........................................................................................2

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND..................................2

I.     THE REQUEST FOR QUOTATIONS.................................................................2

II.    ORIGINAL PROPOSALS AND DISCUSSIONS ...............................................4

III.   ICE'S ORIGINAL AWARD DECISION..............................................................5

IV.   PROTESTS BEFORE GAO AND THE SBA .....................................................6

V.    THE REMAND AND NEW AWARD DECISION ...............................................7

JURISDICTION AND STANDARD OF REVIEW.........................................................8

ARGUMENT ...............................................................................................................10

I.     ICE UNREASONABLY EVALUATED CAC'S TECHNICAL APPROACH WITH RESPECT TO ITS ABILITY TO PROVIDE THE PROMISED AIRCRAFT ...................10

II.    ICE'S EVALUATION OF CAC'S EXPERIENCE WAS FLAWED................................21

III.   ICE'S EVALUATION OF CAC'S PAST PERFORMANCE WAS FLAWED.................26

IV.   ICE CONDUCTED A FLAWED AND UNFAIR EVALUATION OF CSI'S PAST PERFORMANCE ....................................................................................................30

V.    ICE IMPROPERLY EVALUATED CAC'S TECHNICAL APPROACH/QASP...............35

VI.   ICE'S ERRORS INVALIDATED ITS BEST VALUE DECISION, AND PREJUDICED CSI...................................................................................................37

VII.  CSI IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF .........................39

CONCLUSION .............................................................................................................40

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Advanced Data Concepts, Inc. v. United States,*
216 F.3d 1054 (Fed. Cir. 2000) .......................................................................... 18

*American Auto Logistics, LP v. United States,*
117 Fed. Cl. 137 (2014) ............................................................................... 30, 34

*American Auto Logistics, LP v. United States,*
599 F. App'x 958 (Fed. Cir. 2015) ...................................................................... 30

*Bannum, Inc. v. United States,*
404 F.3d 1346 (Fed. Cir. 2005) .......................................................................... 38

*Califano v. Sanders,*
430 U.S. 99 (1977) .............................................................................................. 9

*Citizens to Preserve Overton Park Inc. v. Volpe,*
401 U.S. 402 (1971) ............................................................................................ 9

*CMI Mgmt., Inc. v. United States,*
115 Fed. Cl. 276 (2014) ..................................................................................... 26

*Concourse Grp., LLC v. United States,*
131 Fed. Cl. 481 (2017) ..................................................................................... 35

*FFL Pro, LLC v. United States,*
124 Fed. Cl. 536 (2015) ..................................................................................... 18

*Great Lakes Dredge & Dock Co. v. United States,*
60 Fed. Cl. 350 (2004) ....................................................................................... 10

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
238 F.3d 1324 (Fed. Cir. 2001) ............................................................... 9, 10, 18

*Lab. Corp. of Am. Holdings v. United States,*
116 Fed. Cl. 643 (2014) ..................................................................................... 26

*MORI Assocs., Inc. v. United States,*
102 Fed. Cl. 503 (2011) ..................................................................................... 39

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ............................................................................................ 10

*NetStar-1 Gov't Consulting, Inc. v. United States*,
101 Fed. Cl. 511 (2011) ............................................................... 39

*NetStar-1 Gov't Consulting, Inc. v. United States*,
473 Fed. Appx. 902 (Fed. Cir. 2012) ........................................... 39

*Parcel 49C, Ltd. P'ship v. United States*,
31 F.3d 1147 (Fed. Cir. 1994) .................................................39-40

*PGBA, LLC v. United States*,
389 F.3d 1219 (Fed. Cir. 2004) ................................................... 39

*Precision Asset Mgmt. Corp. v. United States*,
135 Fed. Cl. 342 (2017) ............................................................... 29

*Pricewaterhouse-Coopers Public Sector LLP v. United States*,
126 Fed. Cl. 328 (2016) ............................................................. 8-9

*Springfield Parcel C, LLC v. United States*,
124 Fed. Cl. 163 (2015) ............................................................... 36

*Vanguard Recovery Assistance v. United States*,
101 Fed. Cl. 765 (2011) ............................................................... 34

*Wetsel-Oviatt Lumber Co. v. United States*,
43 Fed. Cl. 748 (1999) ................................................................. 39

COMPTROLLER GENERAL

*Applied Technical Sys., Inc.*, B-404267, Jan. 25, 2011
2011 CPD ¶ 36 ............................................................................ 34

*Belzon, Inc.*, B-404416, Feb. 9, 2011
2011 CPD ¶ 40 ............................................................................ 25

*Dix Corp.*, B-293964, July 13, 2004
2004 CPD ¶ 143 .......................................................................... 22

*Mesa, Inc.*, B-254730, Jan. 10, 1994
94-1 CPD ¶ 62 ............................................................................................................ 22

*NAHB Research Ctr., Inc.*, B-278876, May 4, 1998
98-1 CPD ¶ 150 .......................................................................................................... 29

*Tech. Res., Inc.*, B-253506, Sept. 16, 1993
93-2 CPD ¶ 176 .......................................................................................................... 22

**FEDERAL STATUTES**

5 U.S.C. § 706(2)(A) ........................................................................................................ 9

10 U.S.C. § 2304c(e) ........................................................................................................ 8

28 U.S.C. § 1491(b)(1) ..................................................................................................... 8

28 U.S.C. § 1491(b)(2) .................................................................................................. 8, 9

28 U.S.C. § 1491(b)(4) ..................................................................................................... 9

**REGULATIONS**

48 C.F.R. Part ............................................................................................................ 2. 9

14 C.F.R. Part 117 ........................................................................................................ 35

## INTRODUCTION AND STATEMENT OF THE CASE

Plaintiff CSI Aviation, Inc. ("CSI") respectfully submits this Memorandum in Support of its Motion for Judgment on the Administrative Record ("Motion"). CSI challenges the decision of the United States, acting by and through the United States Department of Homeland Security, Immigration and Customs Enforcement ("ICE" or "Agency") to award Classic Air Charter Inc. ("CAC") an order, against the General Service Administration ("GSA") schedule under Request for Quote No. HSCECR-17-Q-00005 ("RFQ"), to provide Daily Charter Flight Services. In awarding the order to CAC, ICE violated the RFQ and applicable regulations and proceeded without rational basis, entitling CSI to judgment as a matter of law.

First, the most significant obligation under the RFQ is providing the specific aircraft proposed to perform daily rendition flights. During the reevaluation process, ICE reminded the offerors that ███████████████████████████████████████████████████ ████████████████████████████████████████ *See* T. 161 at 4478 (emphasis added). ICE specifically directed offerors to █████████████████████████████████ ████████████████████████████████████████████████████████ *Id.* (emphasis added). ████████████████████████████████ ████████████████████████████████. Notwithstanding, ICE irrationally rated CAC ████████████ under the (most important) Technical Approach subfactor—even though it knew there was a serious risk that CAC might not deliver the proposed planes.

Second, the record confirms that ICE's evaluation of CAC's experience was likewise flawed. Despite the RFQ's preclusion, ICE improperly ███████ ███████████████████ ████████████ to CAC. Further, ICE irrationally ████████████████████████████ ███████████ ████████████ to CAC, deeming facially valid the amorphous roles of these ████████ during

1

████████████████████████████████████████████████████████

performance.

Third, ICE's past performance evaluation cannot stand. CAC's past performance did not merit a [REDACTED] rating, showing a [REDACTED] history that reasonably could not compare to the size, scope and complexity of the ICE effort. Additionally, ICE irrationally and unfairly assessed CSI's past performance with a [REDACTED] rating. ICE's flawed and unfair evaluation allowed it to artificially [REDACTED] CSI's and CAC's history.

Fourth, ICE's best value decision was flawed. Relying on the multiple flaws in its evaluation of CAC, ICE mistakenly concluded that there was a [REDACTED] between CAC's and CSI's [REDACTED], and further yet, that CAC's [REDACTED] This completely erroneous rationale was critical to ICE's best value decision, allowing ICE to improperly premise its award decision on CAC's [REDACTED]. Very simply, ICE's best value/award decision was flawed, to CSI's prejudicial detriment.

For these reasons, as well as the additional reasons stated herein, the Court should grant CSI's Motion for Judgment on the Administrative Record.[1]

**QUESTION PRESENTED**

Whether ICE's award of the ICE task order to CAC was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

## I.     THE REQUEST FOR QUOTATIONS

On July 14, 2017, ICE issued the RFQ under Federal Acquisition Regulation ("FAR") Part 8 seeking proposals from vendors holding contracts under General Services Administration ("GSA") Schedule 599 for daily charter flight services for the ICE Air Operations Division, in

---

[1] Administrative Record citations use the following: "T. __ at [bates page number]."

support of ICE Enforcement and Removal Operations.  T. 6 at 320.  The required daily charter

flight services included two general charter aircraft services—daily scheduled large aircraft

("DSLA") charter flights staged out of five U.S. hubs, and special high risk charter ("SHRC")

flights—for the transportation of illegal aliens.  The RFQ made clear that the single most

significant element of this procurement was the DSLA component, *see id*. at 368, requiring

offerors to propose a fleet of 10 DSLA aircraft "exclusively available for flights every Monday

through Friday, 52 weeks per year."  *Id*. at 334.  As such, ICE required offerors to identify each

promised DSLA aircraft with specificity, including the precise Federal Aviation Administration

("FAA") tail numbers and registered owners for each proposed aircraft.  *Id*. at 361-62.  The

competition was restricted to small businesses.[2]

    The RFQ contemplated award of a single task order,[3] with a one-year base period and

four one-year option periods, for a total potential five-year performance period.  *Id*. at 320, 359.

Per the RFQ, the successful contractor would be selected based on a best value tradeoff basis,

considering the following factors: (1) Technical Capability, (2) Past Performance, and (3) Price.

*Id*. at 364.  Technical Capability was significantly more important than Past Performance, and

the two non-price factors (Technical Capability and Past Performance) were, when combined,

significantly more important than Price.  *Id*.  The RFQ also established three Technical

Capability subfactors: (1) Technical Approach/Quality Assurance Surveillance Plan ("QASP"),

(2) Charter Aviation Experience, and (3) Key Personnel.  *Id*.  The RFQ listed these subfactors in

"descending order of relative importance" and, in the evaluation, ICE would separately score

---

[2] ICE issued the RFQ as a total small business set aside under North American Industry
Classification System Code 481211 (Nonscheduled Chartered Passenger Air Transportation),
which has a 1,500 employee size standard.

[3] The single task order is intended to replace five separate task orders—one for each DSLA hub
airport—that are currently held by CSI.

each subfactor to arrive at an overall Technical Capability rating. *Id*.

The RFQ explained that ICE would evaluate the Technical Capability factor (and three subfactors) using the following scale: Outstanding, Good, Acceptable, Marginal, and Unacceptable. *Id*. at 366. Under the RFQ's definitions, a proposal containing any weaknesses could not achieve an Outstanding rating. *Id*. The RFQ established that ICE would use the following scale to evaluate the Past Performance factor: High Confidence (Outstanding), Substantial Confidence (Good), Satisfactory Confidence (Satisfactory), Limited Confidence (Marginal), No Confidence (Unsatisfactory), and Unknown Confidence (Neutral). *Id*. at 367.

## II. ORIGINAL PROPOSALS AND DISCUSSIONS

CSI timely submitted its proposal on July 14, 2017. Notably, CSI offered 25 specific DSLA aircraft, T. 7 at 536-37, that were singularly available to CSI as a result of its exclusive teaming agreements with three qualified air carriers: ███████████████████████

████████████████████████████████████████████████

███████. CSI assured ICE of its capacity to provide the proposed aircraft by including commitment letters from each air carrier, stating: ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ *Id*. at 554-56.

During discussions, CSI reiterated that all of its proposed aircraft were supported by exclusive contracts with the respective carriers. T. 23 at 1089-90. CSI also described the careful process it had undertaken in order to select these aircraft and carriers:

████████████████████████████████████████████

*Id.*

CAC, and two other competitors, also proposed to perform DSLA flights using one or more of CSI's exclusive air carriers (and their aircraft). Ts. 8, 9, 10. For example, CAC proposed ▓▓▓ from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, representing to ICE that it had ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. T. 8 at 612.[4] Despite having documentary evidence that ▓▓▓▓▓▓ had committed to providing aircraft <u>only</u> to CSI, ICE took no steps during the evaluation process to assess whether these other offerors' promises to provide the proposed aircraft were valid.

## III.   ICE'S ORIGINAL AWARD DECISION

On October 20, 2017, ICE informed CSI of its decision to award the task order to CAC for $646,004,106.40 (including all options), T. 53 at 1657, which ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. T. 1 at 1. ICE based the award decision on the following evaluation ratings:

| | CSI | CAC | | | | |
|---|---|---|---|---|---|---|
| Technical Approach/QASP | | | | | | |
| Charter Aviation Experience | | | | | | |
| Key Personnel | | | | | | |
| **Overall Technical Capability** | | | | | | |
| **Past Performance** | | | | | | |
| Price | | $646.0 M | | | | |

T. 50 at 1579-80, 1596-97. In making the award decision, ICE's source selection authority

---

[4] *See also* T. 9 at 716 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ proposing ▓▓▓▓▓ ▓▓▓▓); T. 10 at 794 (▓▓▓▓▓▓▓▓▓▓▓▓▓▓ proposing ▓▓▓▓▓▓▓).

("SSA") recognized CSI was ████████████████████████████████████, but concluded that CSI's ██████████████████████████████████████ offered by CAC. *Id.* at 1597. The SSA thus decided that CAC represented the best value to ICE. *Id.* at 1598.

## IV. PROTESTS BEFORE GAO AND THE SBA

CSI timely filed a challenge to CAC's size status with the Small Business Administration ("SBA") on October 27, 2017. CSI premised its size protest on indicia of CAC's affiliation with large businesses under the identity of interest and ostensible subcontractor rules. *See* T. 245. Concurrently, CSI timely protested the award to CAC at the Government Accountability Office ("GAO") on October 30, 2017. *See* T. 58.

Before GAO, CSI argued it was unreasonable for ICE to rely on CAC's representation that it had "entered into initial agreements" with ███████████████ for the ███████ aircraft proposed, as no documentation supported the existence of such agreements. Further, the propriety of any preliminary arrangement that CAC may have imagined existed was entirely undercut by the exclusive teaming agreements that CSI had provided with its proposal. Moreover, CSI pointed out that shortly after award, CAC had subsequently admitted to the SBA that it had not executed any agreements with ███████████, and that it had no intention of subcontracting with ████. *See* T. 147 at 4206, 4208-09. CSI argued the lack of any credible evidence that CAC could (or would) provide the proposed aircraft should have undermined CAC's score under the Technical Approach criteria. In addition, CSI asserted that ICE had conducted improper discussions and misevaluated CAC's experience and past performance.

GAO denied CSI's protest on February 7, 2018. T. 155. Seemingly placing significant weight on the fact the RFP did not expressly require that offerors provide teaming agreements, GAO denied CSI's arguments regarding CAC's capacity to provide the offered aircraft. *Id.* at

4420-23.  Although GAO identified numerous other flaws in the evaluation process, including ICE's conduct of unequal discussions and improper evaluation of CAC's experience and past performance, it concluded that these errors were not prejudicial.  *See id*. at 4421, 4430.

## V.     THE REMAND AND NEW AWARD DECISION

On February 16, 2018, CSI filed its original Complaint with this Court in the captioned action.  ECF No. 1.  On February 21, 2018, the Court granted Defendant's motion for voluntary remand to allow ICE to "reconsider its award decision . . . in light of: (1) plaintiff's allegations in the complaint; (2) a recent decision by the [GAO] in this matter; and (3) any new information gathered during the proposed remand period."  *See* ECF No. 13.



During the remand, ICE re-opened discussion and sought revised proposals from all four original offerors.  Significantly, during discussions, ICE reminded offerors that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and specifically directed offerors to ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮  T. 161 at 4478 (emphasis added).  In response to this direction, CSI supported its revised proposal with, *inter alia*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮.  T. 168 4814-40.  No other offeror, including CAC, provided ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

Following the completion of discussions, ICE re-evaluated the four proposals, which included the identification of perceived strengths and weakness and the award of ratings for the Technical Capability and Past Performance factors.  ICE also determined proposed pricing was "fair and reasonable" ▮▮▮▮▮▮▮  T. 196 at 6206.  ICE's remand evaluation conclusions can be summarized as follows:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

| | CSI | CAC | | | | | |
|---|---|---|---|---|---|---|---|
| Technical Approach/QASP | | | | | | | |
| Charter Aviation Experience | | | | | | | |
| Key Personnel | | | | | | | |
| **Overall Technical Capability** | | | | | | | |
| Past Performance | | | | | | | |
| Price | | $635.42 M | | | | | |

*Id*. at 6207. Per the RFQ, ICE conducted a trade-off analysis to determine best value. Based on

the following rationale, ICE again selected CAC instead of CSI for award:



*Id*. at 6225.

## <u>JURISDICTION AND STANDARD OF REVIEW</u>

The Court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) of the

Tucker Act. While the Federal Acquisition Streamlining Act ("FASA") precludes the Court

from hearing protests "in connection with the issuance or proposed issuance of a task or delivery

order," 10 U.S.C. § 2304c(e), FASA's prohibition does not apply to orders issued against GSA

Federal Supply Schedules ("FSS"). *Pricewaterhouse-Coopers Public Sector LLP v. U.S.*, 126

Fed Cl. 328, 342-46 (2016) (jurisdiction to adjudicate protests challenging task or delivery orders issued against GSA FSSs has been upheld by the Federal Circuit). As the Court has consistently held, "FASA's limitation . . . does not extend to task orders issued pursuant to the GSA FSS' under FAR subpart 8.4 . . . ." *Id*. (citation and quotation marks omitted). Here, there is no question that the order at issue was issued against a GSA FSS. The RFQ itself, which was issued via the GSA e-Buy system, stated:

> This acquisition is being conducted in accordance with [FAR] Subpart 8.4,
> "Federal Supply Schedules." The Government is requesting quotes from vendors
> that have contracts under [GSA's] Schedule 599: Travel Services Solutions.

T. 3 at 32. CSI holds a GSA Schedule 599 and submitted a fully-compliant proposal in response to the RFQ, but was not selected for award. Accordingly, CSI is an interested party with standing, and the Court is authorized to award "any relief that the court considers proper, including declaratory and injunctive relief." 28 U.S.C. § 1491(b)(1), (2).

When reviewing an agency's decision in a bid protest, the Court utilizes the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4). The APA provides in relevant part that a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Thus, the Court will set aside a procurement action if: "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. U.S.*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).

Although the Court's review of agency action is deferential, it is also "searching and careful." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *superseded by statute on other grounds as recognized in Califano v. Sanders*, 430 U.S. 99 (1977). When

agency action is alleged to be arbitrary or capricious or an abuse of discretion, the Court will

"determine whether the contracting agency provided a coherent and reasonable explanation of its

exercise of discretion." *Impresa*, 238 F.3d at 1332-33. The contemporaneous evaluation record

must supply the satisfactory explanation for the agency's action. "The reviewing court should

not attempt itself to make up for such deficiencies," or "supply a reasoned basis for the agency's

action that the agency itself has not given." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.*

*Ins. Co.*, 463 U.S. 29, 43 (1983). Thus, when an agency submits a justification for its action, the

facts supporting this justification must be supported by the administrative record. *See Great*

*Lakes Dredge & Dock Co. v. U.S.*, 60 Fed. Cl. 350, 358 (2004).

## ARGUMENT

## I.  ICE UNREASONABLY EVALUATED CAC'S TECHNICAL APPROACH WITH RESPECT TO ITS ABILITY TO PROVIDE THE PROMISED AIRCRAFT

Under the single most significant RFQ requirement, offerors had to propose a fleet of

DSLA aircraft dedicated exclusively to ICE for the contract duration. T. 6 at 334. In structuring

the RFQ, ICE stressed the importance of this requirement by mandating that offerors identify:

- The specific air carriers it would utilize to furnish the DSLA fleet, providing ICE with FAA certifications and copies of insurance coverage for each aircraft owner/carrier (under the Technical Approach subfactor) and aviation safety records (as part of the Charter Aviation Experience subfactor). *Id.* at 361-62.

- The specific DSLA aircraft proposed, providing definitive information for each required aircraft: (1) FAA registration numbers; (2) the identity of the aircraft owner; (3) the total seat number and configuration; and (4) the aircraft make and model. *Id.*

Thus, the RFQ required offerors to identify each and every specific air carrier and exact aircraft

to be used to perform. As an essential part of the remand, ICE sent all offerors ███████████

███████████████████████████████████

███████████████████████████████████████████



T. 161 at 4478 (emphasis added); *see also* T. 162 at 4480; T. 163 at 4482; T. 164 at 4484. In doing so, ICE affirmed that it was obligated to consider an offeror's <u>demonstrated ability</u> to supply the <u>specific proposed aircraft</u> in connection with evaluating each offeror's Technical Approach.[5] That is, ICE unequivocally settled that an offeror's displayed ability to furnish the proposed aircraft (and the production of supporting documents) was an <u>integral</u> part of the evaluation under the <u>most important</u> Technical Capability subfactor.

████████████████████████████, and ICE's explicit direction, CAC ████
████████████████████████████████████████████████
████████████████████. CAC's initial proposal expressly assured ICE it had ███████
████████████ with ███████████████ that would enable it to provide the ██████
████ aircraft identified in its proposal (███████████████████████████
████████████████████).[6] T. 8 at 612-14 (███████████████
████████████████████████). But, the record is clear that CAC had no such

---

[5] In denying CSI's protest regarding CAC's failure to demonstrate its capability to provide the proposed aircraft, GAO placed great weight on the fact that the RFQ did not require offerors to include teaming agreements with their proposals. T. 155 at 4422. GAO went astray. CSI had argued that the very structure of the RFQ inherently necessitated that (1) offerors have in place prior to proposal submission some sort of agreement with air carriers to meet requirements; and (2) ICE evaluate an offeror's demonstrated ability to supply the proposed aircraft. ICE clearly agreed when, during the remand, it demanded that each offeror ███████████████, and clearly stated that offerors would be evaluated on this submission as part of the technical approach.

[6] Notably, the PWS does not allow for the wholesale substitution of aircraft during contract performance. In fact, it addresses substitutions only once—in the context of liquidated damages—warning offerors: "Aircraft substitutions less than 24 hours prior to the scheduled departure time will <u>only be permitted to replace mechanically deficient aircraft or for other unusual circumstances</u>." T. 6 at 341 (emphasis added).

agreements for any aircraft then, ████████████████████████████.

CAC's shortfall was clear from the very start when, upon being notified of the ICE award on October 20, 2017, CAC and an assortment of companies purporting to act on its behalf began concerted efforts to secure the DSLA aircraft necessary to perform. In particular, CSI was informed by team members that since the award, they have been contacted by CAC, or third parties inquiring for CAC, to request their carrier services. For example, CSI received a letter from ████████████████ explaining that ██████████████████████ emailed ███ on October 24, 2017, stating, ████████████████████████████

████████████████████████████████████████████

██████████████ T. 59 at 1879. Additionally, CSI received a letter from ██████████ stating that CAC contacted ████ post-award to advise that ████████████████████████

██████████████████████████ Id. at 1884. Such last-minute scrambling would only have been necessary if CAC had ██████████████████████.

All of the evidence gleaned from the GAO and SBA matters plainly underscores this fact. Throughout the GAO process, CAC failed to produce any agreements with its air carriers for the ██ promised aircraft. Instead, with assistance from CAC and its attorneys, ICE attempted to cobble together bits of documentation to evince CAC's pre-proposal ██████████ Not surprisingly, these efforts were a wholesale failure. The <u>only pre-proposal documents</u> ICE and CAC were able to produce were two CAC email exchanges with ██████████, showing:

- On June 30, 2017, ██████ provided CAC high-level price quotes for ██ geographic locations. T. 127 at 4016-17. The exchange did not manifest any commitments, provide a period for which the quoted prices would be valid, or specify access to any aircraft, much less the ██████ aircraft included in CAC's initial proposal.

- On July 6, 2017, ██████ apparently provided CAC with registrations and airworthiness certificates for ██████████████ T. 128 at 4018-19. This exchange did not show

<u>any</u> agreement to supply the ▮▮▮ aircraft included in CAC's proposal. These vague exchanges clearly failed to show any sort of ▮▮▮ between the parties, ▮▮ or otherwise. They certainly did not establish offer, acceptance, consideration, agreement on price, or anything concrete to support CAC's representations to ICE that it had actual pre-proposal arrangements to deliver the ▮▮▮ aircraft listed in its proposal.

Additionally, ICE produced a document indicating that on November 28, 2017—well <u>after</u> contract award was made—▮▮ had provided CAC with a "letter of commitment" relating to ▮ aircraft. T. 140 at 4045. However, the letter did not identify any specific aircraft to be assigned to the program, and made clear that "flight charges are to be agreed to by both parties" <u>before</u> any actual work is accomplished—that the essential element of pricing had still not been resolved as of November 28, 2017. *Id.*

ICE produced <u>no</u> documents related to CAC's asserted relationship with ▮▮. This is not surprising given that CAC expressly informed the SBA that as of December 7, 2017, it no longer intended to utilize ▮▮ or its aircraft, and it would effectuate performance by providing ▮▮ aircraft and ▮▮ aircraft. *See* T. 147 at 4206, 4208-09. Thus, before GAO, CAC not only failed to support its claim that it had "initial agreements" with the named carriers, but it also failed to demonstrate its ability to provide the specific aircraft enumerated in its proposal.

▮▮▮, CAC ▮▮▮. As a critical part of the remand, ICE expressly requested that all offerors—including CAC—▮▮▮ and ▮▮▮. *See, e.g.*, T. 161 at 4478 (emphasis added). Again, ▮▮▮.

In responding to ICE's request, CAC explained that while its proposal ▮▮▮

████████████████████████████████████████████████████
████████████████████████████████████████

█████████████████████████████████████████████ T. 165 at 4488.  But,

████████, CAC could provide ████████████████████████████████

██████████████████████.

In response to ICE's direction to provide such documentation, CAC produced only the

following related to the ████████████ listed in its revised proposal:

- ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████

---

[7] CAC's revised proposal contained ████████████████████████████████
████████████████████████████████████████████ While CAC

had previously proposed to provide ██████████████████████████ its revised proposal
included █████████████████████████████████. T. 166 at 4628-30.  Thus,

████████████████████████████████████. *See id.*

CAC erroneously asserts █████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ *See id.*

████████████████████████████████████████████████████████

- ████████████████████████████████ [9] *Id*. at 4745-46 (emphasis added).

With respect to the ██████████████ included in its revised proposal, CAC produced only the following:

- A████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████

███████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████

CAC also asserted that ████████████████████████████████████████████
██████████████████████████████ T. 165 at 4489-90, but CAC provided ████████
████████████ to that effect.

And finally, CAC produced only the following with respect to the ████████████████

---

[9] Notably, this was a ████████████ provided to CAC, illustrated by the fact that both ████████
████████████ included a ████████████████ from ████ in their revised proposals.  T. 171 at 5115; T. 173 at 5317.

████████████████████████████████████████████

included in its revised proposal:

- █████████████████████████████████████████████████████████
  ████████████████████████████████████████████
  ██████████

- █ ████████████████████████████████████████
  ████████████

CAC also asserted that its ██████████████ with ████████████████████████████
██████████████████████ T. 165 at 4490.  Yet, CAC did not ██████████████████
██████████████████████, and, in fact, ████████████████████████████████████.
        In fact, ██████████████████ CAC's revised proposal provided ICE with ██████
████████████████████████████████████████████████████.  Mostly, CAC's
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ And,
the ██████████████ that purport to relate to the current bid failed to ████████████████████
████████████████████, or ████████████████████████████████████.  Even the
██████████████—arguably the ████████████████ and the ████████████████ that
directly sought to support CAC's revised proposal—only evidenced ██████████████
████████████████████████████████████████████████████████████████
██████████████████████.  They certainly were ██████████████████.  And, CAC did not
████████████████████████████████████████████████████████████████████
██████████████ in CAC's proposal, but which CAC has ████████████████████████████.
In other words, ████████████████████████████████████████████████████████████
████████████████████████████████████████████████t.
        In contrast, CSI's revised proposal contained ██████████████████ that clearly and



precisely ████████████████████████████. Specifically, CSI provided ICE

with: ██████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

    Despite the ████████ of CAC's ████████████████████—and CAC's failure to ████

████████████ specifically requested during remand—ICE assigned CAC ██ ████████ rating

under the ██████████████████████. T. 190 at 6118. In doing so, ICE ████ awarded

CAC a ████████████ for providing ██████████████████████████████████████

██████████████████████████████████ that supposedly ████████████

████████. *Id.* at 6115; *see also* T. 196 at 6208. ICE also curiously ██████████████ for its

ability to provide ██████████████, as apparently evidenced by CAC's ████████████:



T. 190 at 6115 (emphasis added). There is no question these observations materially contributed

to ICE's decision to award CAC ██ ████████████ rating for the ████████████████████

██████████████████████████

████████, and the ███████████████████████. In turn, these ratings heavily influenced ICE's trade off analysis and award decision. But, ICE's evaluation was plainly unreasonable.

While CSI recognizes the discretion afforded to agencies in evaluating proposals, such discretion is not unfettered. When an agency's evaluation conclusions are being questioned, the Court must "determine whether the . . . agency provided a coherent and reasonable explanation of its exercise of discretion." *Impresa*, 238 F.3d at 1332-33 (citations and quotations omitted); *FFL Pro, LLC v. U.S.*, 124 Fed. Cl. 536, 555-56 (2015). In order for agency discretion to be reasonable, it must not only satisfy the APA "arbitrary and capricious standard," it must also "evinc[e] rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. U.S.*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (emphasis added). An agency cannot rationally ignore clear risks in an offeror's proposal, or deviate from its evaluation methodology. Although ICE demanded ████████████████████████████████████ ██████, unequivocally making that capability part of the technical evaluation, ICE (1) arbitrarily ignored CAC's ██████████████████████████████████████████ ██████████; and (2) irrationally overlooked the fact that CAC's ████████████████████ ████████████████████████████████████████████████.[10,11]

---

[10] ICE irrationally failed to recognize that the proposals of ███████████████ suffer from the same flaw as CAC's. ICE posed the ███████████████ ████████████████████████████████████████████████████████. T. 163 at 4482; T. 164 at 4484. However, the record demonstrates that neither ███████████ provided ICE with ████████████████████ than CAC did. Indeed, like CAC, the ██████ those offerors were able to provide were ███████████████. For example, ████████████████████████████████████████████ T. 171 at 5115. ██████████████████████████████████████████████ ████████████████ T. 173 at 5317.

18

████████████████████████████████████████

This is particularly significant given that CAC's pricing was ███████████ ████████████████. *See* T. 195 at 6185 (listing CAC's total price as $635,419,376.40 and the ████████████████). It was also ██████████ than the pricing proposed by CSI—the incumbent contractor. *See id.* Nonetheless, ICE simply ignored the <u>very palpable risk</u> that CAC's ███ pricing would be █████████████████████████████████████ ██████████████████████████████.

In that context, CAC's proposal presented a very real risk that CAC would ████████ ██████████████████.[12] Notably, ICE has been concerned about this <u>very</u> risk from the onset of this procurement. In its Acquisition Plan, ICE noted that any ████████████████ ████████████████████████████████████████████████████████ T. 2 at 9. Additionally, in crafting the procurement, ICE opted to ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████. *See id.* at 16. While it theoretically was ICE's prerogative to accept the obvious risk that CAC would ████████████████, what ICE could not <u>rationally</u> do was turn a blind eye to that risk <u>entirely</u>—*i.e.*, to assign CAC a related ████████ rating. In order to <u>reasonably</u> accept the risk CAC presented, ICE's assigned subfactor rating

---

[11] Additionally, as even ICE acknowledged, the ████████████████████████████████ ████. This is entirely inconsistent with the ████████████ included in CAC's proposal. *Compare* T. 167 at 4857, *with* T. 165 at 4511.
[12] ICE also ignores the fact that CAC's ████████ indicate that ████████████████ ████████████████████████████████████. T. 147 at 4201. This approach is completely contradictory to CAC's technical proposal, which sets forth CAC's ████████████ *see* T. 165 at 4516, and ████████████████████████, *see id.* at 4514—████████████ ████████████, *see* T. 179 at 5621-22. This appears to be a classic bait and switch, which would furnish ICE with ████████████████████ CAC proposed, and which would deliver a ████████████████████.

<u>had</u> to reflect that risk.  It absolutely did not—at least not in any rational way.

Oddly, the SSA introduced the concept of ████████████████ in the source selection decision.  However, the risk analysis was done irrationally and missed the point entirely.  Specifically, when discussing CAC's ████████████████████████████, the SSA called out ████ ████████████████████████████████:

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

T. 196 at 6217.  But, this was not the risk CAC's proposal posed.  Rather, the obvious risk in CAC's proposal was twofold.  First, there was CAC's ████████████████████████
████████████████.  Next, there was the realistic possibility that ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████.  If this occurred, ████████████████████
████████████████████████████████████

ICE made clear that it would ██████████████████████████████
████████████████████████████████████████████████████.  It was bound to do so.  Clearly, this did not occur when ICE assessed CAC a ████████████
████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

20

████████████████████████████████████████████
████████████████████████████████

████████████████████████. These clear risks should have, <u>at the very least</u>, resulted in ICE assessing CAC ████████████████████████████████████ ████████████████████████████ T. 6 at 367. This alone would have ████████████████████████████████████ rating. *See id*. at 366 ████████████████████████████████████).

Certainly CAC was not entitled to the ██████████████ rating CSI's approach was assigned, or the completely irrational conclusion that CAC's proposal was ██████████ to CSI's in this area. T. 196 at 6225 (████████████████████████ ████████████████████████████████████) In fact, this conclusion was necessary to ICE's entire trade-off decision, which stated:



*Id*. Thus, ICE's source selection decision hinged on ICE's understanding that CAC merited █ ██████████ rating under the ████████████████████████. It did not. A reasonable evaluation that accurately and reasonably accounted for the inherent risk that CAC ██████████ ████████████████████████████████████████ —would have rated CAC ██████████ (and certainly ██████████ CSI, who provided ████████████████████████████). CSI's protest should be sustained on this basis.

## II.    ICE'S EVALUATION OF CAC'S EXPERIENCE WAS FLAWED

CAC's proposal likewise did not support ██████ rating for the experience subfactor. The RFQ required offerors to ████████████████████████████████ ██████. T. 6 at 362. By providing data for ████████████████████████████,

and with which CAC ████████████████████████, CAC's proposal was ██████ as to these requirements.  This undermined ICE's evaluation of CAC.

Still more, CAC's proposal did not evince experience that ███████████████ ████████████  For instance, CAC claimed to have (1) ██████ of experience ██████████████ ███████████████████████████████████████████████████████ ████████████ (2) ██████████████████████████████████████████ and (3) ██████████ ███████████████████████████████████  *See* T. 165 at 4540; *see also* T. 6 at 362.  CAC critically attributed these ████████████████ to ██████████, ███████████ ██████████████████████████  T. 165 at 4540, 4541; *see also* T. 165 at 4549-52.  Problematically, ICE conflated ████████ ███████████████████████████████████████ ████████████████████████████████████████.[13]  T. 6 at 365; T. 190 at 6118-19; ██████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████████████████████" (citation omitted) (emphasis added)).  That is, the RFQ <u>precluded</u> ICE from ██████████████████████████████████  Yet, that is exactly what ICE did, improperly assessing CAC ████████████.  T. 190 at 6118-19; *see also* T. 190 at 6119 (evaluating ████████████████████ (emphasis added)).

On its own, CAC's experience was ████████████ in meeting the RFQ's requirements.

---

[13] Founded in 2012, CAC was not a ████████████████████████████ ██████████████████  T. 165 at 4505; *cf. Tech. Res., Inc.*, B-253506, Sept. 16, 1993, 93-2 CPD ¶ 176 at 3 ("an agency[] may ████████████████████████████ ████████████████████████████████████████████████████████ ██████████ (citations omitted)); *Mesa, Inc.*, B-254730, Jan. 10, 1994, 94-1 CPD ¶ 62 at 7 ("An agency may ████████████████████ ████████████████████████████████." (citations omitted)).

To summarize, CAC ████████████████████████████████████

████████████████████████████████████ and can ████████████

████████████████████████████████████ T. 165 at 4541

(describing the ████████████████). ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████",[14] *Cf.* T. 190 at 6120.  Rather, as ICE recognized, CAC's experience was ████████

████████████████████.  *Id.* at 6119 (emphasis added).  That is, CAC ████████████

████████████████████████████████████

████████████████████████████████.  *See* T. 197 at 6227; T. 59 at 1871 (¶ 22).

Properly evaluated, CAC merited an ████████████████ subfactor rating.  *See* T. 6 at 366.

      Assuming *arguendo* ICE properly attributed ████████ experience to CAC, ICE's

evaluation of CAC remained flawed.  ████████████████ described ████████████████

████████████████████████████.  T. 165 at 4549-52.

Further, ████████ suffered from a ████ of data about ████████████████.  *See*

*id.*  Also absent was ████████████████████████████████

████████████████████████████████████

████████[15]  T. 190 at 6119 (emphasis added).  Yet, ICE rationalized: ████████████

████████████████████████████████████

---

[14] CAC's ████████████████████████████████████████████████████.  T. 165
at 4505, 4551.
████████████████  *Id.* at 4551.  But, CAC failed to note this data in its revised submission, *see id.*
at 4540-42, and ████████████████████████████████████████.
[15] In addition, ████████
████████████████.  *See* T. 165 at 4552 (████████████████).

███████ *Id.* Without more, ICE's rationale was groundless, *i.e.*, arbitrary and capricious.[16]

Nor can CAC's experience reasonably be offset by the experiences of ███████

███████████████████████████████████

███████████████████████████████████

███. *See* T. 252 at 6504. To bolster its proposal, CAC ███████████

███████████████████████████████████

██████████████████████ T. 165 at 4487. In so proposing, CAC admitted: ██

*Id.* at 4491 (emphasis added). To ████████ role, CAC's proposal stated: ███

████████████████████████

████████ *id.* at 4506; and ████████████████

██████████████ *Id.* at 4543. CAC did <u>not</u> ████████

█████████████. And, <u>at most</u>, █████ amorphous role would pertain ████

████████████████████████

██████████. *Compare* T. 6 at 339 (███████████████

███████████████████), *with id.* at 336 ████

████████████); *see also id.* at 368

████████████████████████

█████████████). Still, ICE concluded that █████ had a facially valid

role in the effort, conflating CAC's ███████████ experience with █████. T.

---

[16] CAC further sought to ███████████████ of CAC
that has purportedly been providing ████████████ T. 165 at 4541.
However ██████████████████████████████
██████████████████████████
███████████████████' involvement in the ICE contract.

██████████████████████

190 at 6119.[17,18]  Plainly, ICE had no rational basis to do so.  *Cf. Belzon, Inc.*, B-404416, Feb. 9, 2011, 2011 CPD ¶ 40 at 7  ("Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (emphasis added)).

Similarly, ICE did not have a reasonable basis to ▮▮▮▮▮▮▮▮▮ CAC. ▮▮ allegedly has ▮▮▮ of experience ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ n.  T. 165 at 4541-42; *see also* T. 165 at 4507.  CAC did not intend to ▮▮▮▮▮▮▮▮, but for ▮▮▮▮▮▮▮▮▮ *Id.* at 4542; *see also id.* at 4507 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).  Deciding ▮▮▮▮▮▮ role providing ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was facially valid, ICE ▮▮▮▮▮▮▮ CAC.  T. 190 at 6119.  ICE's action was irrational, however, premised as it was on an <u>anemic</u> ▮▮▮ that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Nor did CAC reasonably ▮▮▮▮▮ ▮▮▮▮▮▮▮▮ or ▮▮▮▮▮ role as a ▮▮▮▮▮▮▮▮ or explain how ▮▮▮▮▮▮ would bear on successful contract performance.  Indeed, ICE recognized these limitations: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  T. 190 at 6119 (emphasis added).  Meaning, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[17] ICE recited word-for-word various portions of CAC's submission to substantiate ▮▮▮ ▮▮▮▮▮▮  *Compare* T. 190 at 6119, *with* T. 165 at 4487, 4506, 4543. Whereas CAC touted and ICE ▮▮▮ alleged ▮▮▮▮▮▮ ▮▮▮▮▮▮ T. 165 at 4540, 6119, CAC's proposal at best describes ▮▮▮ of experience ▮▮▮▮▮▮▮▮▮▮ as the ICE effort.  *See id.* at 4542.

there was no rational justification for ICE's reliance on ████ to elevate CAC's experience.

ICE should have been troubled by the lack of experience evinced by CAC. Instead, ICE improperly deemed all of CAC's ████████████████████████████████████ as facially valid. *Cf. Lab. Corp. of Am. Holdings v. U.S.*, 116 Fed. Cl. 643, 652 (2014) ("[T]he agency must articulate the reasons for its procurement decision including a rational connection between the facts found and the choice made." (citation omitted)). In turn, ICE improperly ████████ CAC's experience rating from ████████████. *Compare* T. 99 at 3097, *with* T. 190 at 6120. Against this backdrop, ICE's evaluation had no rational basis and was flawed, *i.e.*, was arbitrary and capricious. *See CMI Mgmt., Inc. v. U.S.*, 115 Fed. Cl. 276, 288 (2014) (the Court will set aside an agency's decision as arbitrary and capricious if the agency entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that runs counter to the evidence before it (citations and quotation marks omitted)).

## III. ICE'S EVALUATION OF CAC'S PAST PERFORMANCE WAS FLAWED

CAC's past performance did not merit a ████████████████ rating. ICE evaluated ████ related Past Performance Questionnaires ("PPQ"). ████████████████████████ ████████████████████████████. T. 11 at 949-76. CAC's PPQs reflected:

| Agency Name | Contract Value | Period of Performance | Contract Identification (Description of Services) |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

*Id.* at 949-60.  Per the RFQ, ICE evaluated their relevance for size, scope and complexity.  T. 194 at 6145-47.  ICE concluded that ▓▓▓ of CAC's PPQs ▓▓▓▓▓▓▓▓▓▓ had ▓▓▓▓▓▓▓▓▓▓, ▓▓▓▓▓▓▓▓ had ▓▓▓▓▓▓▓▓▓, and ▓▓▓▓▓ provided ▓▓▓▓▓▓▓▓▓▓▓▓ of successful performance.  *Id.* at 6145-46.  ICE's evaluation was flawed.

First, in reviewing CAC's ▓▓▓▓▓▓, ICE failed to note that the ▓▓▓▓▓▓▓▓▓▓▓ referenced ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See id.* at 6145.  ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  T. 165 at 4505.  ICE also failed to question (or substantiate) the basis underlying ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, and the purported ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *See* T. 194 at 6145; *see also* T. 11 at 949, 952.  With minimal clarification, ICE would have be able to learn that ▓▓▓▓▓▓ was ▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  *See, e.g.,* ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  Meaning, CAC was a ▓▓▓▓▓▓▓▓▓▓ effort—▓▓▓▓▓▓▓ as ICE assumed.  *See* T. 194 at 6145.  Still more, given that CAC intended ▓▓▓▓▓▓▓▓ to be synonymous with all things ▓▓▓▓▓▓ T. 165 at 4491, it bears underscoring that <u>CAC was</u> ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Further pertinent, it was <u>precisely because</u> of the ▓▓▓▓▓▓ CAC received from ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ that ICE arrived at a ▓▓▓▓▓▓▓▓▓▓▓▓ that CAC will perform successfully.  T. 194 at 6145.  ICE's evaluation should have accounted for ▓▓▓▓▓▓▓▓▓▓▓▓ CAC, and CAC's still ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.[19]  It did not.

Turning to CAC's ▓▓▓▓▓▓▓, this reference similarly suffered from ICE's failure to

---

[19] There is no data as to ▓▓▓▓▓ CAC provided services for the ▓▓▓▓▓.  *See* T. 11 at 949.



rationally evaluate CAC's ▮▮▮▮▮▮▮ in that effort.  *See* T. 11 at 955 (reviewed by ▮▮

▮▮▮▮▮▮▮▮▮▮▮).  ICE made a material assumption regarding the ▮▮▮▮ of

CAC's work: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  T. 194 at 6145.  In conjunction with the claim by ▮▮

▮▮▮▮▮▮ that CAC's work was ▮▮▮▮▮ ICE concluded that the ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮ to the ICE effort.  *Id.*  But, ICE's assessment was flawed.  First,

CAC's own words undermined the ▮▮▮▮ of its work: ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮  T. 165 at 4592.  Restated, CAC mainly ▮▮▮▮▮▮▮▮ for

that effort, in direct contrast to ▮▮▮▮▮▮ for ICE.  Next, there was no data as to ▮▮▮

▮▮▮▮▮▮▮▮▮▮.  *See id.* ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *See* T. 59 at 1871 (¶ 22).  More, ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮ ICE's requirements.  To summarize:



T. 103 at 3182.  As such, the ▮▮▮▮▮▮▮▮ of CAC's ▮▮▮▮▮▮▮▮▮▮ with

the ICE effort.  *Cf.* T. 194 at 6145.  Thus, with its ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮, this reference had ▮▮▮▮▮▮▮ at best.  *Cf. id.* (assigning ▮▮▮▮▮▮).

ICE's flawed evaluation extended to the ▮▮▮▮▮▮ PPQ, which ICE concluded had

▮▮▮▮▮▮.  *Id.* at 6148.  Very simply, ICE should <u>not</u> have considered this PPQ.  It is

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

inappropriate to consider a company's record where it will not bear on the likelihood of successful performance by the prime, *i.e.*, where it will not make meaningful contribution during the contract. *NAHB Research Ctr., Inc.*, B-278876, May 4, 1998, 98-1 CPD ¶ 150 at 3 (citations omitted). Likewise, when considering the performance of a subcontractor's affiliate, attention must be given as to whether the resources of the affiliate will affect the performance of the subcontractor—whether the affiliate will have meaningful involvement during performance. *See Precision Asset Mgmt. Corp. v. U.S.*, 135 Fed. Cl. 342, 357 (2017) (citations omitted). As noted in Section II, CAC ███████████████████████████████ during contract performance.[20] Similarly, CAC made ████████████████████████████████████████████████████— its ███████████████████████████████████████████████ T. 165 at 4491—but gave no explanation as to what ███████████████████████████ ████████████████████ the ICE effort. *See generally id.* Without more, it was unreasonable for ICE to consider ████████████' reference, and to attribute it to CAC's performance rating.

In the final analysis, the records shows that ICE relied on the following to assign CAC a ████████████████████ past performance rating:

- A PPQ prepared by ██████████ CAC's ████████, regarding CAC's ██████████████████████████████████████████████████.

- Another PPQ regarding CAC's ██████████████, during which CAC ████████████████████████████████████████████.

- CAC's █████████████████████████████████████████████ ██████████████████████████.

---

[20] In addition, CAC did not submit ██████████████████████████████████████.
[21] According to ICE, the ██████████████████████████████ ████████████████████████████ T. 194 at 6146.

- PPQs for CAC's ████████████, considered for the "████ of the ICE requirement. (Emphasis added).
- █ PPQ for the ████████████████, neither of whom have a meaningful role during contract performance.

T. 194 at 6145-47. In other words, CAC received a ████████████ rating based on ████████████████████████████████████████████ ████████████████████████████████ *Id.* Noticeably absent from ICE's review were comments about CAC's ████████████ ████████████████████████—observations the SSA made during his initial review of CAC that remain relevant. *See* T. 50 at 1584. These facts do not rationally support CAC's ████████████ rating. Rather, CAC's ████████ ████████ performance reasonably evinced a ████████ expectation of successful performance, meriting a ████████████ rating. *See* T. 6 at 367.

In sum, ICE's analysis of CAC's past performance failed to afford meaningful consideration of all information in the record, rendering it arbitrary and capricious. *See American Auto Logistics, LP v. U.S.*, 117 Fed. Cl. 137, 186 (2014), *aff'd*, 599 F. App'x 958 (Fed. Cir. 2015) ("[A]lthough highly deferential, the [C]ourt's review of an agency's past performance evaluation is neither an automatic endorsement of the agency's actions nor tolerant of observable mistakes.") ("[E]ach past performance evaluation is reviewed on a fact-specific basis.").

## IV. ICE CONDUCTED A FLAWED AND UNFAIR EVALUATION OF CSI'S PAST PERFORMANCE

ICE irrationally and unfairly assessed CSI with a ████████████ rating,

According to the ████ reviewer: ████████████████████████████████ T. 11 at 959. This is an apples to oranges comparison. CAC's response for consideration is <u>vastly different</u> from ████████████—*i.e.*, the ████████ is not comparable.



█████████ CSI's initial rating of ███████████████. *See* T. 194 at 6151. ICE evaluated ███ PPQ and ███ Past Performance Information Retrieval System ("PPIRS") reports for CSI, ████ of which "████████████████████████████████████████████████ ████████████████████████████████████████████ T. 194 at 6149. ████████████ ████████████████████████, ICE stated:



*Id.* However, as the record shows, there were numerous flaws with ICE's conclusion that CSI's history evidenced ██████████████████████████ of successful performance.

As ICE noted, each of ████████████ evinced CSI's █████████████████ ████████████████, T. 12 at 981-███████████████████████████ ████████████ T. 194 at 6151. That is, ████ report showed CSI ████████████████ ██████████. *Id.* (██████████████████████████████████████). For instance, not only was CSI repeatedly commended for its ██████████████████), but also, for providing ████████████████████████████████████ ██████████████████████████████. T. 12 at 982, 985, 988, 991, 994, 997, 1000. Indeed, CSI's performance was best summarized as:



*Id.* at 994.  As the ████████████████████████████████████████, *see* T. 165 at

6126, CSI's ████████████████████████████████████████████████████████████████

of successful performance under the RFQ.  In recognition of these facts, ICE assessed CSI with a

██████████████████████████████████████████.  T. 50 at 1580-81.

    <u>Yet</u>, ICE irrationally assessed CSI with ███████████████████████████████████.

T. 194 at 6151.  In doing so, ICE████████████████████████████████████████████

██████████.  *Id.* at 6148.  ██████████, however, ICE's evaluation ████████████████

████████████████████████████.  *Id.* at 6148, 6163-66, 6168-69.  As the █████████████

██████████████████████████████████, ICE's emphasis █████████████████████████

████████████████████████ CSI's performance was manifestly unreasonable.

    As ICE is <u>well aware</u>,████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████



. For instance,

CSI's                                                                                                    ,
showing the                                                            meeting ICE's
requirements.  What              was ICE's evaluation of            , irrationally
by its review of the
*Id.*  As the      variance in
its evaluation of CSI's            , it is clear that ICE saw th
Generally, ICE would have inquired about this

---

[22] Indeed,
*See* T. 12 at 994 (
In fact, it is for this reason that

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. ICE did not, <u>knowing full well</u> that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Even so, ICE relied ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ CSI's rating. Plainly, ICE's evaluation of CSI's ▓▓▓▓▓▓▓▓ was flawed and unfair. *Cf.* ▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

      Compounding its mistakes, ICE's evaluation of CSI's work with ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ was also flawed and unfair. There is no question an agency has great discretion in deciding past performance relevance—a highly subjective evaluation—but agency discretion cannot justify an unreasonable and unfair review. *See American Auto Logistics*, 117 Fed. Cl. at 186; *Vanguard Recovery Assistance v. U.S.*, 101 Fed. Cl. 765, 788 (2011). Here, ICE considered ▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓ about the ▓▓▓▓▓▓▓▓▓▓▓▓ concluding that CSI's ▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓ and there was a ▓▓▓▓▓▓▓▓ that CSI would perform under the ICE contract. *Id.* at 6148, 6149-50. Regarding the ▓▓▓▓▓▓▓▓▓ntract, ICE stated that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.*at 6148. As to ▓▓ ICE noted: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* ICE unmistakably considered these ▓▓▓▓ meaningful, concluding the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ *Id.* Yet, ICE never asked CSI about ▓▓▓▓▓▓▓▓ during two rounds of discussions. *See generally* T. 162; T. 176. All the more troubling, ICE questioned CAC about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓—▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. T. 161 at 4479. As a result, CAC resolved these

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[REDACTED] in its final proposal. *See* T. 165 at 4505, 4507. Based on ICE's flawed and inequitable discussions, CSI did not have the same chance to clarify the [REDACTED]. *See Concourse Grp., LLC v. U.S.*, 131 Fed. Cl. 481, 488 (2017) (the Court will review an agency's actions when conducting the discussions to ensure compliance with fundamental fairness and determine whether they were arbitrary and capricious (citations omitted)).

Providing ICE with [REDACTED] of successful performance here, CSI's record rationally and fairly merited a [REDACTED] rating. Not only did CSI's [REDACTED], but in addition, ICE's review of CSI's [REDACTED] showed CSI's [REDACTED] *See* T. 194 at 6150-51

[REDACTED] Despite its attempt to [REDACTED] CSI's [REDACTED]—CSI [REDACTED], T. 180 at 5710—ICE cannot rely on discretion and subjectivity to artificially [REDACTED] CSI's and CAC's history. ICE's evaluation of CSI's performance must be rational and fair. As the record shows, it was not, to CSI's prejudicial detriment.

## V. ICE IMPROPERLY EVALUATED CAC'S TECHNICAL APPROACH/QASP

ICE improperly assessed CAC's proposal [REDACTED] rating under the Technical Approach/QASP subfactor. *See* Section I, *supra*. To begin with, [REDACTED] [REDACTED][24] T. 6 at 362 (emphasis added). As the SSA expressly recognized in his tradeoff analysis: [REDACTED]

---

[24] The [REDACTED] referred to in the RFQ is the [REDACTED]

█████████████████████████████████████████████████

███████████████████████████████████

████████████████████████████████ T. 196 at 6216.  Strikingly, ICE's evaluation of

CAC <u>did not</u> criticize this failure.  T. 190 at 6115-18.

ICE improperly rubber-stamped CAC's proposal, stating: ███████████████████

█████████████████████████████████████████████████

██████████████████████████████ *Id.* at 6116.  But, page 5 of CAC's quote stated:

████████████████████████████████████████████

██████████████████████████████ T. 165 at 4513 (emphasis added).  In <u>no way</u>

did CAC's response <u>rationally qualify</u> as ███████████████████████████████████.

In fact, CAC's <u>own</u> words indicate it ████████████████████████████.  *See id.*

Yet, ICE did <u>nothing</u>.  *Cf.* T. 6 at 364-65 ██████████████████████████████

███████████████████████████████████████

████████████████████████████████████ (emphasis added)).  Having

██████ to meet a requirement, CAC's quote was ████████████.  *See* ██████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████ (citations

omitted)).  At a <u>minimum</u>, CAC merited a ████████ under this subfactor, which would have

█████████ it from receiving ████████ rating per the RFQ.  *See* T. 6 at 366.

Further, ICE unreasonably assessed CAC with ████████ for proposing ███████████████.

*See* T. 190 at 6115; *see also* Section I, *supra.* ████████████████████████████

████████████████████████.  T. 165 at 4510-12.  ICE determined that this approach

████████████████████████████████

 and [REDACTED]

[REDACTED]

[REDACTED] T. 190 at

6115. But, as established in Section I, CAC's proposal did not reasonably evince [REDACTED]

[REDACTED] Certainly then, CAC did not merit a

[REDACTED]

Against this backdrop, ICE's failure to reasonably evaluate CAC's proposal cannot stand.

## VI.   ICE'S ERRORS INVALIDATED ITS BEST VALUE DECISION AND PREJUDICED CSI



ICE's flawed evaluation contributed to a flawed best value determination, to CSI's

prejudicial detriment.  As described above, the SSA's tradeoff analysis was premised on two

mistaken notions, the first of which was that there was a [REDACTED] between CAC's and

CSI's [REDACTED].  *See* T. 196 at 6217.  It is clear that CAC's

[REDACTED] with the SSA, and was [REDACTED] in his best value

decision.  *See id.*; *see also* T. 6 at 364 ([REDACTED]

[REDACTED]).

But, as discussed herein, (1) CAC's and CSI's proposal[REDACTED] (2) "[REDACTED]

[REDACTED] and (3) CAC's proposal

did [REDACTED]

[REDACTED] *Cf.* T. 196 at 6217.  On its own, this undermined the SSA's reliance on the

[REDACTED] of CAC's [REDACTED] as a means of turning to, and then choosing,

CAC's [REDACTED].  *Cf. id.* [REDACTED]

[REDACTED]).  Restated, the SSA's flawed reliance on CAC's [REDACTED] was critical

to his best value decision, allowing him to choose CAC's [REDACTED].  *Id.*  As CAC's proposal did

[REDACTED]

not merit the value the SSA attributed to it, ICE's flawed best value decision must be set aside.

Adding to the SSA's flawed tradeoff analysis was his flawed performance risk analysis:



*Id.* The SSA's consideration of risk was especially necessary under the DSLA thrust of the RFQ. Improperly, however, the SSA focused on



in CAC's proposal. *See* Section I, *supra.* Nor did the SSA reasonably consider the risk inherent to the _____ from CAC's _____ *Compare* T. 1 at 1 _____ *with* T. 196 at 6206 (CAC's _____); *cf.* T. 196 at 6206 _____

_____). In the face of these weighty mistakes, the SSA's decision to award to CAC was flawed and cannot stand.

ICE's decision to award to CAC instead prejudiced CSI. To establish prejudice, a protester need not show that but for the agency's errors, it would have received the award. *See Bannum, Inc. v. U.S.*, 404 F.3d 1346, 1358 (Fed. Cir. 2005). Rather, it need only show that there was a substantial chance it would have received award had the agency not made the errors, *id.*, as CSI has shown here. ICE's award decision was premised on numerous flaws in the evaluation process and is invalid. These errors, taken together or separately, fatally infected ICE's best value determination, rendering the award to CAC irrational and unlawful. If not for these errors, ICE would have awarded the task order to CSI.

## VII.  CSI IS ENTITLED TO PERMANENT INJUNCTIVE RELIEF

Based on the foregoing, this Court should permanently enjoin ICE from proceeding with the task order awarded to CAC.  CSI has demonstrated that ICE's award decision was infected by multiple, prejudicial evaluation errors.  CSI is entitled to injunctive relief to remedy these errors because: (1) it will suffer irreparable harm if injunctive relief is not granted; (2) the balance of hardships favors granting injunctive relief; and (3) granting injunctive relief is in the public interest.  *See PGBA, LLC v. U.S.*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).

The irreparable harm to CSI in the absence of an injunction is clear: CSI will have been deprived the opportunity to compete fairly for an award that it had a substantial chance of winning but for ICE's improper evaluation and award decision.  This is precisely the type of irreparable harm that this Court has found warrants entry of permanent injunctive relief.  *See, e.g., NetStar-1 Gov't Consulting, Inc. v. U.S.*, 101 Fed. Cl. 511, 530 (2011), *aff'd*, 473 Fed. Appx. 902 (Fed. Cir. 2012); *MORI Assocs., Inc. v. U.S.*, 102 Fed. Cl. 503 (2011).

The balance of harms also weighs in favor of an injunction.  ICE will suffer no harm if performance of this illegally awarded task order is permanently enjoined, and ICE is required to fix its mistakes.  In fact, because CAC's ability to actually perform has been called into question, ICE will likely benefit from an injunction.

Moreover, the issuance of an injunction here is in the public interest.  ICE has violated procurement laws and regulations in its conduct of the procurement and, thus, it is necessary to award injunctive relief to correct its errors and restore integrity to the procurement process.  *See Wetsel-Oviatt Lumber Co. v. U.S.*, 43 Fed. Cl. 748, 753 (1999) ("[W]here the federal procurement process is tainted by arbitrary and capricious government action, the public interest is served by restoring integrity to the procurement process.") (citing *Parcel 49C, Ltd. P'ship v.*

*U.S.*, 31 F.3d 1147, 1154 (Fed. Cir. 1994)) (other citations omitted).  This is especially true given that this is a procurement for vitally important services that will have a profound impact on immigration enforcement for years to come.  It is imperative, therefore, that ICE get this right. Accordingly, the public interest weighs in favor of an injunction.

## **CONCLUSION**

For the foregoing reasons, CSI respectfully requests that this Court grant it judgment upon the administrative record.  CSI respectfully requests that the Court grant the requested declaratory and injunctive relief, requiring ICE to terminate CAC's award and re-procure the services in the subject procurement in accordance with the statutes, regulations, and a reasonable exercise of discretion.

Respectfully submitted,

Vedder Price, P.C.

s/ Eric J. Marcotte
Eric J. Marcotte
David M. Hernandez
Kelly E. Buroker
Tamara Droubi

*Counsel for CSI Aviation, Inc.*

DATED: May 15, 2018

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was electronically filed, via the Electronic Case File ("ECF") System of the United States Court of Federal Claims, on May 15, 2018. I understand that this document will be sent to all parties via the Court's ECF System. In accordance with the Rules of the Court of Federal Claims ("RCFC"), Appendix E, Rule 12(c), CSI has, therefore, served notice on counsel of record.

Dated: May 15, 2018

s/ Eric J. Marcotte
Eric J. Marcotte, Attorney of Record
Vedder Price P.C.
1401 I Street, NW, Suite 1100
Washington, DC 20005
(202) 312-3336 (phone)
(202) 312-3322 (fax)
emarcotte@vedderprice.com

*Counsel for Plaintiff*
*CSI Aviation, Inc.*